IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
9/23/2024
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

| | | |
|---|---|---|
| SAMMY J., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-00364 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MARTIN O'MALLEY, | ) | By:   Hon. Thomas T. Cullen |
| Commissioner of Social Security, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Sammy J. ("Sammy") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1385.[1] Sammy suffers primarily from back pain. On review of his application for SSI, an administrative law judge ("ALJ") concluded that, despite his limitations, Sammy could still perform a range of light work. Sammy challenges that conclusion, calling for reversal and remand on numerous grounds. Although Sammy misses the mark in his unfocused and scattershot challenges to the ALJ's ruling, the court must agree with him in principle: the ALJ failed to apply the correct legal standards with regard to medical opinions, and the court will therefore remand this matter for proceedings consistent with this opinion.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Under Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any vacancy in such office.").

## I.   STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Sammy filed his first SSI application on July 2, 2018, alleging disability as of August 1, 2017, due to degenerative disc disease and additional back pain. (R. 92–93 [ECF No. 6-1].) That application was denied on January 25, 2019 (R. 104), and Sammy did not pursue it further.

Sammy filed a second SSI application on August 31, 2019, alleging disability beginning on November 1, 2017, due to: debilitating lower back, hand, and knee pain; migraines; depression; and anxiety. (*See* R. 120–21.) His application was denied initially and upon reconsideration. (*See* R. 128–30, 146–48.) ALJ Joseph Scruton reviewed those decisions following a hearing on July 27, 2021, at which Sammy appeared along with his counsel and a

vocational expert, and issued an unfavorable decision on August 5, 2021. (*See* R. 150–68.) After Sammy requested review, the Appeals Council remanded for another hearing because the ALJ failed to admit a piece of relevant evidence into the record. (R. 170.) The ALJ held a second hearing on December 14, 2022. (R. 38–63.) After considering the relevant medical evidence, Sammy's medical records, and the testimony of vocational expert Dr. Adina Leviton, the ALJ issued another unfavorable decision on December 23, 2022. (R. 20–31.) In summary, the ALJ concluded that Sammy suffered from several severe medical impairments, but he retained the RFC to perform light work with additional limitations. Because there exist a significant number of jobs in the national economy that an individual with Sammy's limitations could perform, the ALJ determined that Sammy was not disabled within the meaning of the Act. (*See id.* at 31.) The Appeals Council denied Sammy's request to review that decision (R. 1), and Sammy filed suit in this court on June 21, 2023 (Compl. [ECF No. 2].)

## A.    Legal Framework

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"— including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**B.    Medical Evidence**

**1.    Pre-Onset of Disability Records**

On October 3, 2017, Sammy visited Nurse Practitioner Betina Muse at a family medicine practice in Rocky Mount, Virginia, complaining of unexplainable pain in the "lower right side of his back." (R. 603.) The objective observations were unremarkable, but Muse noted Sammy's report of "paraspinal pain to right lumbar region." (R. 604–05.) Muse diagnosed him with back pain and gave him intramuscular injections of Toradol and Depomemdrol and prescribed him Prednisone and Robaxin. (*Id.*)

Sammy returned to see Muse the next week, asserting that the medication prescribed at the last visit did not provide any relief for his back pain. (R. 600.) In fact, according to Sammy, the pain had spread to his "thoracic spine and lumbar spine with radicular pain to bilateral legs," though he reported he was not in pain at the time of the visit. (*Id.*) An objective examination was again unremarkable aside from a "slow, steady gait." (R. 602.) Muse diagnosed him with "[p]ain in thoracic spine" and "[a]cute midline low back pain with bilateral sciatica." (*Id.*) Muse ordered x-ray imaging of his back. (*Id.*) The x-rays returned an impression of "[s]pondylosis with no acute findings," as well as "[s]ome degree of scoliosis to thoracic spine." (R. 599, 633–34.) On October 16, Muse ordered an MRI of the lumbar spine. (R. 600.)

On October 27, Sammy underwent an MRI of this thoracic spine that revealed intervertebral disc space narrowing, multiple mild disc bulges, a small annulus tear, and a "moderate concentric disc bulge with a central disc protrusion" that "displaces bilateral . . . nerve roots." (R. 632.) Nurse Tammy Parker called Sammy to notify him of the results and refer him to a neurosurgeon or orthopedist of the spine; Sammy told her he was taking Hydrocodone for

his pain and informed her that he had just started a new job in which he was lifting regularly. (R. 596.)

On October 31, Sammy went to the emergency department at Franklin Memorial Hospital, complaining of sharp back pain. (R. 594.) This emergency visit was apparently the result of an acute exacerbation of his chronic back pain, and Sammy ascribed the pain to his physically demanding job. (R. 594–95.) A physical examination found his back was tender, and he could only raise his straight leg 30 degrees. (R. 594.) Dr. Benjamin Philpott's clinical impression of Sammy's pain was right lumbar radiculitis, and he prescribed him Decadron and Dilaudid, which improved Sammy's condition. (R. 595.)

### 2.      Post-Onset of Disability Records

On November 2, Sammy saw Dr. Edgar N. Weaver, Jr., a neurosurgeon at Neurosurgery Ion. (R. 593.) He presented with acute back pain and "vague" symptoms in his right leg. (R. 594.) Sammy could "flex and extend without significant antigravity pain," but his "[s]traight leg raising was questionable." (*Id.*) Dr. Weaver reviewed Sammy's recent MRI scan and diagnosed Sammy with an "acute discogenial axial back pain problem with minimal radicular symptoms" which "should resolve with time when he gets through the acute inflammatory period at 6 to 8 weeks." (*Id.*) Dr. Weaver estimated that Sammy would be able to return to his heavy-lifting job the following January. (*Id.*)

On November 13, Sammy called the Rocky Mount family practice to request more medication, and he was prescribed more Voltaren and Gabapentin. (R. 593.)

On December 14, Sammy saw Nurse Jessica Conley at Neurosurgery Ion and reported that he felt about the same as when he saw Dr. Weaver on November 2. (R. 592.) Specifically,

Sammy complained of "lower back pain that radiates . . . to the ankles and feet," "numbness and tingling along the same pathways," and weakness in his right leg. (*Id.*) His physical examination was mostly normal, revealing no acute distress, a stable gait, and non-tender lumbar region. (R. 593.) Conley prescribed Elvail and Robaxin, increased Sammy's dosage of Neurontin/Gabapentin, referred him to get an epidural steroid injection ("ESP"), and instructed him to follow-up in 5–6 weeks.  (R. 592.) In the ensuing weeks, Sammy rescheduled his ESI several times. (R. 591.)

On January 31, 2018, Sammy and his partner returned to see Nurse Muse at Rocky Mount family practice with complaints of anxiety. (R. 588.) Muse agreed to prescribe Sammy a low dosage of Prozac, but declined to prescribe narcotics for Sammy's back pain because those prescriptions would have to come from his neurosurgeon. (R.589–91.) When Muse told Sammy she would not be prescribing him narcotics, he "became upset" and he and his wife "loudly express[ed] their dislike for not receiving narcotics."  (R. 589, 591.) According to Muse, Sammy and his wife's "statements and behavior [were] concerning for drug-seeking behavior." (R. 591.)

Sammy had the ESI done on February 8, which provided relief for just two days before his back pain returned. (R. 587.)

On February 14, Sammy saw Nurse Valerie Abbott at Neurosurgery Ion, complaining of the same lower back pain. (*Id.*) A physical examination showed his gait was steady but antalgic, there were no motor or sensory deficits, and he had an active range of motion without pain. (*Id.*) Abbott refilled his prescriptions, referred him for another ESI and regular physical

therapy ("PT"), and instructed Sammy to follow up in four weeks. Sammy received his ESI successfully the following day (R. 630) and received another on March 15 (R. 628).

Sammy returned to see Abbott on March 29. (R. 584.) He told Abbott that the pain had worsened such that he could not get out of bed, the second ESI did not work, and that he did not go to PT because of his pain. (R. 585) Nevertheless, his physical examination returned the same objective results as the last one—steady but antalgic gait, full sensory and motor skills, and an active range of motion without pain. (*Id.*) Abbott instructed Sammy to "[r]eturn to clinic to see Dr. Howes for surgical discussion." (*Id.*)

On April 25, Sammy returned to Neurosurgery Ion to discuss a potential decompression surgery with Dr. Howes. (R. 583.) After reviewing Sammy's MRI images and noting his pain was not improving with physical therapy and pain management, Dr. Howes noted that a "decompression [surgery] may be reasonable." (*Id.*) Sammy's physical examination from that day showed no acute distress and normal neurologic functioning. (*Id.*) Sammy returned on May 30 for a pre-surgery examination, complaining of the same debilitating pain but denied having any weakness, numbness, or tingling. (R. 580.) Sammy scheduled the surgery with Dr. Howes for June 22. (*Id.*)

On June 11, Sammy had another MRI which showed "no significant interval change from the prior study." (R. 624–25.)

On June 18, Sammy's dog was tragically hit by a car. (R. 578.) When he bent down to pick up his dog, Sammy "felt a pop" and was in severe pain; after initially declining to go to the emergency room, Sammy went to the Roanoke Memorial Hospital emergency department. (R. 576, 578.) A physical examination showed pain to the lumbar back; Sammy "exhibit[ed]

decreased range of motion, tenderness, bony tenderness, pain and spasm." (R. 577.) An x-ray of the lumbar spine showed spondylosis but no evidence of fracture or dislocation. (R. 578.) Sammy was discharged. (*Id.*)

On June 22, Dr. Howes conducted the decompression surgery[2] (R. 572), and Sammy was discharged from the hospital two days later (R. 576).

On July 9, Sammy saw Physician's Assistant Hope Poetker at Neurosurgery Ion for a post-surgery follow-up. (R. 563.) Sammy complained of left leg and buttock pain but denied having any back pain. (*Id.*) Indeed, a physical exam showed that his lumbar region was non-tender, his gait was stable, there were no sensory deficits in the lower extremities, and a straight leg raise was negative. (R. 564.) Poetker refilled[3] his Oxycodone prescription but instructed him to wean off it. (*Id.*) Sammy was instructed to follow up in 4 weeks, and not to bend, twist, or lift anything heavier than 15 pounds. (*Id.*)

Sammy returned on August 8 to see Dr. Howes for post-surgery follow up, and shared that he was again feeling lower back and leg pain. (R. 561, 563.) Dr. Howes instructed Sammy to try PT and return in 6 weeks to reevaluate. (*Id.*)

On August 29, Sammy presented to Poetker at Neurosurgery Ion with complaints of left leg pain. (R. 559.) His physical exam was essentially the same as the one on July 9, but for a "mild limp." (*Id.*) During a telephone call with a nurse two days before, Sammy stated that he had not gone to PT because of the pain. (R. 560.) Imaging showed the part of his back that

---

[2] For reasons unknown to the court, the ALJ's discussion of the medical records begins at the June 22, 2018 surgery. (*See* R. 26.)

[3] It is unclear who initially prescribed the Oxycodone or when.

had been operated on was stable. (*Id.*) Poetker prescribed additional painkilling narcotics and scheduled a follow up in 6 weeks. (*Id.*)

Sammy went to the Franklin Memorial Hospital emergency department on October 1 with complaints of the same lower back and left leg pain; he left before he was treated. (R. 558.)

On October 4, Sammy presented to a new doctor at Neurosurgical Ion—Dr. John Entwistle—"to find assistance with pain control to get him through until he sees pain management on October 17." (R. 555–57.) Despite continued reports of extreme pain, Sammy's physical reports showed a normal gait, normal range of motion of the lumbar spine, and no motor, reflex, or sensory deficits. (R. 557.) On October 10, Sammy saw Dr. Howes. (R. 554–55.) As before, his complaints were severe, but his physical examination was normal; Dr. Howes recommended PT and lifestyle changes for the leg pain, and told Sammy he would consider an MRI. (R. 555.)

Sammy saw Nurse Robin Behr, a pain-management specialist, on October 17, and relayed that his lower back and leg pain was worse since his June surgery. (R. 550.) Behr noted that his gait was antalgic, the lumbar region was mildly tender (mostly over the scar), and that Sammy had other physical limitations. (R. 553.) Behr planned for Sammy to go to PT, though Sammy was "not excited about" it. (*Id.*) Moreover, based on Sammy's score on a Screener and Opioid Assessment for Patients with Pain ("SOAPP"), Behr opined that Sammy was at high risk for narcotics abuse,  and she did not "recommend narcotics as a long[-]term treatment option." (*Id.*)

On October 31, Sammy met with Dr. Howes for another follow-up. (R. 547.) This time, a physical examination showed Sammy walked with a limp and his "[s]trength show[ed] some give-way weakness" in the left leg. (R. 549.) They also discussed a second surgery to alleviate Sammy's pain, to which Sammy agreed. (*Id.*)

On November 8, Dr. Howes conducted another minimally invasive surgery and Sammy was discharged the following day. (R. 529, 531.)

Neurosurgery Ion could not get in touch with Sammy for several days after the surgery for a post-operation check, but finally did on November 19. (R. 526–529.) In that phone call, Sammy reported that he felt terrible and that his left leg pain was unbearable. (R. 527.) During that phone call, Sammy reported that he had been taking Valium for the pain and that he accidentally dropped half his Oxycodone prescription down the sink. (R. 527.) The nurse with whom Sammy was speaking told him that she could not refill the narcotic prescription early after Sammy called back asking for an early refill. (R. 526–27.)

On November 26, Sammy returned to Neurosurgery Ion for a follow-up. (R. 525.) He complained of the same leg and back pain, but his physical exam was largely normal aside from an antalgic but stable gait. (*Id.*) This time, Sammy reported that "he dropped 3/4 of his pain meds down the drain by accident" and asked for Valium. (*Id.*) The attending Nurse declined to give him more Valium but refilled his Oxycodone prescription and scheduled a follow-up with Dr. Howes for December 12. (R. 526.) At that appointment, the physical exam and objective findings were all normal, and Dr. Howes noted that Sammy "is improving with his" lower back pain. (R. 524.)

On December 27, Sammy presented to Nurse Behr for a pain-management consultation. (R. 521.) Though he complained of "a burning pain in his left calf," he noted that his pain was better since his November 8 surgery. (*Id.*) The only objective abnormality that Behr noted was the tender left calf. (R. 522.)

Sammy returned to Neurosurgery Ion on January 24, 2019, for a follow up with Nurse Furrow. (R. 519.) Sammy complained of back and left-leg pain. (*Id.*) His physical exam and objective findings were unremarkable: stable gait, non-tender lumbar region, and no sensory deficits in his lower extremities. (*Id.*) To that point, Sammy still had not gone to PT and Furrow emphasized that he needed to begin. (R. 520.) Furrow scheduled a follow up with Dr. Howes in three months. (*Id.*) On the day of that appointment, however, Sammy cancelled the appointment "for personal reasons." (R. 518.) On May 21, Sammy met with Dr. Howes and was "[d]oing ok after surgery," but still had "some back pain." (R. 517.) Objective findings were normal, and Dr. Howes recommended PT and a follow-up in three months. (*Id.*)

Sammy reported to Franklin Memorial Hospital on June 11 for a PT consultation. (R. 512.) Sammy had a normal gait but poor posture when he sat. "Correction of posture increase[d] [Sammy's] low back symptoms." (R. 513.) His physical therapist instructed Sammy to perform a home exercise program two to three times per day and scheduled treatment twice a week for four weeks. (R. 514.) Sammy returned to PT on June 14 and stated that his pain was "a little better overall" since beginning PT three days earlier. (R. 511.) Sammy's physical therapist noted his compliance was good, that he displayed fair progress, and that he "completed all exercises . . . with minimal to no pain." (*Id.*) But on June 18, Sammy cancelled his appointment due to back pain from mowing his lawn. (R. 508, 510.) Sammy came in on

June 19, but was unable to complete many of the exercises with his physical therapist. (R. 507–509.) After that last appointment, Sammy did not return for PT. (R. 509.)

On July 29, Sammy saw Nurse Behr for a pain-management appointment. (R. 504.) Sammy said he was in a great deal of pain and objective findings partially supported his statements: he had a tender lumbar region and pain with extension and facet loading, but his strength and other sensations were otherwise intact. (R. 505.)

On August 21, Sammy saw Nurse Abbott at Neurosurgery Ion, complaining of back and leg pain. (R. 503.) The physical examination was largely unremarkable except for a steady but antalgic gait and slightly diminished strength in his left hip flexor. (*Id.*) Abbott's impression of imaging was "[m]oderate spondylosis with no instability suggested on flexion-extension views." (R. 504.)

After a few more months of purportedly unsuccessful pain management, Sammy presented again to Nurse Behr on November 26 to discuss pain management. (R. 496.) Sammy complained of leg pain and some lower back pain but admitted that "his pain [was] better since" his second surgery. (*Id.*) He also noted that one of his medications, Lyrica, and a muscle relaxer were helpful in controlling his pain but said he hadn't been taking them for several weeks. (*Id.*) A physical exam showed tenderness on the lumbar region and pain with extension and facet loading. (R. 497.)

On December 24, Sammy returned to see Nurse Behr and stated his back and leg pain were severe and that the pain was exacerbated when he sat, stood up, or walked. (R. 641.) Sammy had been prescribed and was taking Norco, but after a drug test returned positive for marijuana, Behr stopped the prescription. (*Id.*) The objective tests showed Sammy's lumbar

region was tender and he had pain with extension and facet loading, but his strength and sensation were otherwise intact. (R. 642.) Behr referred Sammy for an updated MRI of the lumbar spine and noted that she would "send him back to neurosurgery as we have nothing left to offer." (*Id.*)

On February 3, 2020, Sammy presented to Neurosurgery Ion "very frustrated with continued pain" in his lower back and left leg. (R. 679.) The physical exam revealed his gait was antalgic, his lumbar region was tender, but there were no other physical irregularities. (*Id.*) The attending physician's assistant noted that the "MRI does not show any significant abnormalities." (R. 680.)

On March 2, Sammy took an EMG and nerve conduction study and the results were normal. (R. 697.) He saw Dr. Howes on March 18 and conveyed his ongoing pain. (R. 693.) His physical exam was normal and he walked without a limp. (R. 696.) Dr. Howes concluded that Sammy did "not have any obvious surgical issue," but that they would consider a dorsal-column stimulation. (*Id.*)

Sammy had a telehealth appointment with Nurse Behr on May 5 and continued complaining of leg and back pain. (R. 714.) Behr instructed Sammy to follow up in 12 weeks. (R. 716.)

Sammy began complaining of a knee injury in August and requested imaging of his knee. (R. 732.) Sammy's x-rays, taken on September 1, were normal. (R. 733.)

On October 6, Sammy had an office visit with Nurse Behr to discuss management of his chronic back and leg pain as well as his newfound right-knee pain. (R. 762–64.) His gait was abnormal and antalgic, his lumbar region was tender, and he had pain with flexion and

extension. (R. 763.) Behr also noted physical signs of knee pain; nevertheless, Sammy refused a referral to orthopedics to investigate his knee pain. (R. 764.) Behr did, however, refer Sammy for thoracic imaging. (*Id.*)

On January 5, 2021, Sammy again presented to Nurse Behr, complaining that his right knee pain had worsened. (R. 758.) His gait was antalgic but stable, his lumbar region was tender, he had pain with flexion and extension, and he had pain in his calf and knee during a positive straight leg raise, but otherwise had full strength in his legs and no sensory deficits. (R. 759–60.) This time, Sammy agreed to an orthopedics referral for his right knee pain. (R. 760.)

On March 6, Sammy presented to the Franklin Memorial Hospital emergency department with complaints of lower abdomen pain that radiated to his back. (R. 766.) A computerized tomography ("CT") scan suggested a 6 mm kidney stone was the likely culprit. (*See* R. 769.) Two weeks later, Sammy had surgery to remove the kidney stone. (R. 745.) At a follow up on April 12, Sammy noted that he had been doing well since the surgery and "denie[d] any back or flank pain." (R. 746.) A July 30 follow-up with his urologist was similarly unremarkable. (R. 795.)

On February 7, 2022, Sammy presented to an urgent care facility, complaining of shoulder pain that had been ongoing for a month without relief from over-the-counter medicine. (R. 806–07.) There was no swelling but his deltoid was tender. The attending doctor ascribed the pain to "some type of over use injury"—Sammy told him that he did "maintenance work for [a] rental property"—and referred Sammy to orthopedics. (R. 807.)

Sammy saw an orthopedic physician assistant on February 16 and complained of pain that began in his left trapezius muscle, radiated to his left shoulder and elbow. (R. 814.) At that appointment, Sammy said that he had a "history of back pain" that was "managed by pain management," but that his pain-management doctor had "moved to Colorado." (*Id.*) Sammy's x-rays showed acromioclavicular joint arthritis. (R. 816.) The physician's assistant recommended PT and steroid injections, but Sammy declined both. (*Id.*)

The next day, Sammy presented to Tri Area Health Clinic at Ferrum, complaining of depression, anxiety, and left shoulder pain. (R. 801.) Testing revealed mild depression and severe anxiety; he was prescribed Prozac. (*Id.*) About a month later, on March 16, Sammy returned to the Tri Area Health Clinic with complaints of depression and severe left shoulder pain. (R. 797.) During that visit, Sammy's drug screen was positive for marijuana and methamphetamine. (R. 798.)

## C.   Opinion Evidence

### 1.   First SSI Application

On initial review of Sammy's first disability application on January 25, 2019, Dr. Bert Spetzler reviewed Sammy's records and performed an RFC assessment. (*See* R. 99–100.) Dr. Spetzler opined that Sammy could occasionally lift 20 pounds, frequently lift 10 pounds, and could stand, walk, or sit for 6 hours in an 8-hour workday. (R. 99.) Dr. Spetzler said Sammy had postural limitations and that he could balance, stoop, kneel, crouch, and crawl frequently, climb ramps/stairs occasionally, but never climb ladders. (R. 99–100.) Consistent with those findings, Dr. Spetzler concluded that Sammy demonstrated a maximum work capability of

"light." (R. 102.) Dr. Spetzler determined that Sammy was "not disabled" and, based on that determination, Sammy's first SSI application was denied. (R. 102, 104.)

### 2. Second SSI Application

On initial review of Sammy's second disability application on April 4, 2020, Dr. William Rutherford, Jr. reviewed Sammy's records and performed an RFC assessment. (R. 120–29.) Dr. Rutherford thought that Sammy could, in an 8-hour workday and with normal breaks, occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk for 2 hours (with normal breaks), and sit for 6 hours. (R. 125.) Dr. Rutherford thought Sammy had postural limitations and opined he could occasionally climb ramps/stairs, stoop, or crawl; frequently balance, kneel, and crouch; but never climb a ladder. (R. 126.) Based on those findings, Dr. Rutherford concluded that Sammy's maximum sustained work capability was "sedentary." (R. 128.) Dr. Rutherford's examination led to a finding of "not disabled," and Sammy's second SSI application was denied at the initial level. (R. 130.)

Sammy appealed and Dr. Spetzler returned to consider Sammy's records at the reconsideration level of his second application. Dr. Spetzler reviewed Sammy's records and agreed with all of Dr. Rutherford's findings. (R. 142–43.) And like Dr. Rutherford—but unlike his first-time reviewing Sammy's records in January 2019—Dr. Spetzler found Sammy's maximum sustained work capability was "sedentary." (R. 146.) On September 14, 2020, Dr. Spetzler signed his findings, affirming the initial disability determination. (R. 146–47.)

On September 5, 2020, Sammy saw Nurse Amanda Whitley, a medical consultant with the Virginia Department of Rehabilitative Services, for a consultative exam and records review. (R. 738–43.)  Whitley filled out a functional assessment and medical source statement that

concluded Sammy could lift and carry up to 10 pounds frequently, 11–50 pounds occasionally, but never more than 50 pounds. (R. 742.) She also opined that Sammy could sit for 4 hours in an 8-hour workday, as well as stand and walk for 6 hours. (*Id.*) Whitley also concluded that Sammy could reach, handle, feel, and grasp with both his right and left hand frequently. (R. 743.) Finally, Whitley determined that Sammy could bend or kneel frequently, and stoop occasionally, but that he could never squat. (*Id.*)

### D.   Relevant Testimony

At the July 27, 2021 hearing before the ALJ, Sammy testified about his medical history, symptoms, and limitations. Sammy testified that, since his 2018 back surgeries, he felt constant pain that began in his lower back and radiated down to his left heel. (R. 72.) The pain varied from sharp to "dull and achy" to feeling like pressure on his back. (*Id.*) Sammy testified that the pain affected his ability to sit and stand; after 20–30 minutes of sitting, his pain increased and he had to stand up and move around for 30–45 minutes; after 20–25 minutes of standing, he has to walk or sit down to alleviate the increased pain. (R. 72–74.) He stated that he could only walk 10–15 minutes before he had to stop to rest and frequently had to use a self-prescribed cane to help his balance. (R. 75.) Sammy also testified that the pain made him lie down for anywhere from 15 minutes to an hour, sometimes up to 5 times a day. (R. 74.) Sammy also testified that he suffered from neuropathy in his hands (R. 72, 76–77), kidney stones (R. 77–78), stomach issues (R. 78), and depression and anxiety (R. 78–79).

Sammy also testified to various aspects of his daily life. He struggled with household chores and had to enlist family members to help with the more labor-intensive chores like carrying in groceries, taking the trash out, and mowing the lawn. (R. 75–76.) Sammy stated

that he had trouble lifting anything more than "10 to 15 pounds." (R. 83.)  Sammy said that he did not have difficulty driving. (R. 79.) He spent most days watching television at home and taking care of his three dogs and two cats. (*Id.*) He testified that his fiancée lived with him and "help[ed] [him] with everything." (R. 80.) Sammy also testified that he had trouble sleeping, and while his medicine helped, he still tossed and turned and felt groggy when he woke up. (R. 80–81.)

Sammy testified again at the December 14, 2022 hearing to largely the same effect. He stated that he had not had any kidney stones in approximately the last nine months. (R. 46.) He asserted that his constant lower back pain persisted and radiated down both his legs. (R. 47.) At the July 2021 hearing, Sammy had testified that the pain only went to his left leg, so his attorney asked him when the pain began in his right leg, to which Sammy responded April 2020. (R. 47–48.) He also mentioned pain in both knees that began several months ago, but that the pain in his left knee was worse than that in the right. (R. 48–49.) Sammy testified that he was still having pain in his shoulders and that the pain in the right shoulder was worse, making it hard to bring his right arm up to chest height. (R. 49–50.) He was still having trouble sitting and standing and could do both for shorter periods of time than compared to the last hearing. (*Compare* R. 50, *with* R. 72–74.) Sammy's need to lie down during the day, however, decreased to twice or three times a day. (R. 50.) His ability to walk also improved according to his testimony, as he testified he needed a cane less frequently than he did at the prior hearing. (R. 51.)

Sammy testified that his wife left in October of 2021. (R. 44.) Since then, he did not have a car and did not drive, and for that reason had been having difficulty getting to his

medical appointments. (R. 44–46.) He also stated that he did not want to go to hospitals for fear of contracting COVID and passing it along to his grandchildren or elderly parents. (R. 45.)

As for his daily life, Sammy stated that he cooked and folded his laundry. (R. 51–52.) He testified that a friend came over frequently to help him around the house as well. (R. 52.) Sammy testified that he ordered groceries online and would pick them up at the store, though he did not mention how he got to the store or how he picked up the groceries and returned them home. (R. 55–56.) As for sleeping, Sammy stated that he still had a hard time, but for different reasons than the last hearing—this time, because his body "won't shut down." (R. 55.)

## E.     The ALJ's Opinion

In the operative decision, the ALJ concluded that Sammy suffered from lumbar spine degenerative disease, intermittent incident of kidney stones, and onset of shoulder disorder, all of which qualified as severe impairments.[4] (R. 22.) He found that Sammy did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 24.) "After careful consideration of the entire record," the ALJ found that Sammy had the RFC

> to perform light work as defined in 20 CFR [§] 416.967(b) except the claimant cannot crawl, climb ladders or scaffolds, or kneel; can occasionally stoop and crouch; cannot be exposed to hazards (such as machinery and heights); cannot be exposed to temperature extremes; can occasionally overhead reach bilaterally; has a concentration, persistence, and maintaining pace level adequate to perform simple, routine (non-complex) tasks.

---

[4] The ALJ also determined that Sammy's depression and anxiety were medically determinable impairments, but they were not severe enough to render him disabled. Sammy does not challenge this determination.

(R. 24.) As a result, the ALJ found that a significant number of jobs exist in the national economy that Sammy can perform—such as router, inspector, or assembler—and that Sammy therefore was not under a disability from the date of his application—August 31, 2019— through the date of the decision. (R. 30–31.)

### III.   ANALYSIS

Sammy lodges two overarching arguments in favor of remand: (1) that the ALJ's assessment of Sammy's physical impairments and the ALJ's RFC findings are not supported by substantial evidence (Pl.'s Br. at 21–28 [ECF No. 14]); and (2) that the ALJ's assessment of Sammy's allegations is not supported by substantial evidence (*id.* at 28–32). In doing so, Sammy takes a shotgun approach in hopes of raising a specific point that might stick. While that approach is generally not recommended (and often wastes the court's time and scarce resources), it worked today.

In arguing that the ALJ's RFC finding was wrong, Sammy claimed that the ALJ's analysis of the relevant medical opinions was legally deficient. (Pl.'s Br. at 25.) Without opining on the merits of Sammy's disability, the court must agree with Sammy. Because the ALJ's reliance on the relevant medical opinions in crafting Sammy's RFC was legally deficient, the court must remand.

When relying on medical opinions or prior administrative medical findings to evaluate a claimant's RFC, ALJs must comply with 20 C.F.R. § 404.1520c, which provides a list of "articulation requirements" that they must discuss when explaining their decision on each opinion's persuasiveness. *See* § 404.1520c(b). "That regulation requires an ALJ to 'explain how he considered the supportability and consistency factors for a medical source's medical

opinions." *Stephen R. v. O'Malley*, No. 21-2292, 2024 WL 3508155, at *4 (4th Cir. July 23, 2024) (cleaned up). "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation, and consistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023) (citing 20 C.F.R. § 404.1520c(c)(1)–(2)). It is not enough for an ALJ to state that a certain opinion is "supportable" by or "consistent" with the record; here, too, the ALJ's written decision must build a "logical bridge between the evidence and [his] conclusion" on a certain medical opinion. *Oakes*, 70 F.4th at 214. The court must remand when it is left to guess as to how, why, or to what extent an ALJ found a particular opinion persuasive. *See Stephen R.*, 2024 WL 3508155, at *4.

Here, the ALJ considered four different medical opinions in crafting his RFC, but only found Dr. Spetzler's 2019 Opinion partially persuasive; he concluded that the rest were unpersuasive. (R. 29.) Absent from his written decision, however, is any mention of "supportability" or "consistency" of those opinions. (*Id.*) Though some courts have said that "the ALJ need not necessarily use the words 'supportability' or 'consistency,'" his consideration of those factors must be clear from the discussion. *Todd A. v. Kijakazi*, No. 3:20-cv-594, 2021 WL 5348668, at *4 (E.D. Va. Nov. 16, 2021). A generous reading of the ALJ's discussion shows that he considered the opinions' consistency with the record. (*See* R. 29 (citing to other parts in the record when discussing each opinion's persuasion).) But "it is not obvious that the ALJ considered the supportability factor, nor is there any analysis that provides a 'narrative discussion' that adequately explains the ALJ's reasoning with regard to"

any of the opinions. *Rosa M. v. Kijakazi*, No. 9:22-cv-04494, 2023 WL 9101308, at *8 (D.S.C. Dec. 8, 2023). In other words, the ALJ failed to comply with 20 C.F.R. § 404.1520c insofar as he did not "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision." § 404.1520c(b)(2).

Here, "the ALJ's discussion works backwards from a conclusion, rejecting any opinion that contradicts that conclusion without sufficient analysis." *Crystal C. v. O'Malley*, No. 7:22-cv-00729, 2024 WL 1342596, at *8 (W.D. Va. Mar. 29, 2024). In his sparse, three-paragraph analysis of the medical opinions, the ALJ cites the determinations of the state agency consultant at the initial and reconsideration stages, then summarily concludes: "The initial determination is partially persuasive while the reconsideration determination is not persuasive." (R. 29.) The court is "left to guess" as to how these opinions were evaluated. "Instead, the ALJ went 'straight from listing evidence to stating a conclusion.' This was error and requires that this case be remanded." *Crystal C.*, 2024 WL 1342596, at *9 (quoting *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019)).

The gravity of the ALJ's failure to explain his reasoning is bolstered by the fact that he appears to have conflated two of Dr. Spetzler's medical findings.[5] If he did not, the ALJ failed

---

[5] Dr. Spetzler reviewed Sammy's medical records as part of his first application for SSI benefits, and reviewed his records again when Sammy appealed the denial of his *second* application for SSI benefits. Granted, the alleged disability onset dates between Sammy's first application (August 1, 2017) and his second (November 1, 2017) is negligible, but the ALJ was obligated to explain how he decided to give what weight to either opinion, and how those opinions were or were not supported by and consistent with the record evidence, or how new medical evidence undermined the later opinion. *E.g.*, *Cole v. Saul*, 2021 WL 1109399, at *12–13 (M.D.N.C. Mar. 23, 2021) (noting that, on a challenge to the reliance on "outdated" state-agency consultative examiners' opinions, "the ALJ recognized that the state agency medical consultants did not have the opportunity to review evidence that post-dated their opinions" and included limitations in the plaintiff's RFC to account for that).

to explain why a doctor's finding in January 2019 was more persuasive than the same doctor's different finding a year-and-a-half later—and rendered with the benefit of a more robust record.

When reviewing Sammy's first SSI application at the initial level on January 25, 2019, Dr. Spetzler concluded that Sammy's maximum exertional level was "light." (R. 102–03.)  But when he reviewed Sammy's second SSI application at the reconsideration level on September 14, 2020, Dr. Spetzler concluded that Sammy's maximum exertional level was "sedentary." (R. 146–47.) That the same doctor could change his mind is hardly surprising, given that much of the record includes medical records from after January 25, 2019. The court is left to guess as to how the ALJ came to his conclusion on Dr. Spetzler's opinions. There may be a good reason for the ALJ to find Dr. Spetzler's January 2019 finding more persuasive than his September 2020 finding (and the other two medical opinions he cited, dated April 4, 2020, and September 5, 2020), but the ALJ must provide that reason in his written decision so that the court can do its job.

Perhaps recognizing this error, the Commissioner asserts in a footnote that even if the ALJ "restricted [Sammy] to a sedentary RFC, the record shows that the ultimate outcome of the case would have been the same." (Gov't Br. at 18 n.2 [ECF No. 15].) That may be so, but the court cannot ignore the ALJ's failure and will not affirm on the Commissioner's speculative basis.

## IV.   CONCLUSION

For the reasons stated above, the ALJ failed to comply with important regulations in explaining his decision. Those failures frustrate the court's review and, accordingly, this case

must be reversed and remanded to the Commissioner for further proceedings consistent with this opinion. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 23rd day of September, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE